## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEIL R. BRONSTEIN, AS TRUSTEE FOR THE BRONSTEIN CHILDREN PARTNERSHIP, individually and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>-vs-<br><br>MGP INGREDIENTS, INC., DAVID COLO, DAVID S. BRATCHER, and BRANDON M. GALL,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Neil R. Bronstein, as Trustee for the Bronstein Children Partnership ("Plaintiff"), individually and on behalf of all others similarly situated, by his undersigned attorneys, alleges the following against MGP Ingredients, Inc. ("MGPI" or the "Company") and the other defendants identified below (collectively, "Defendants") based on, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of public filings with the United States Securities and Exchange Commission (the "SEC") by MGPI, other regulatory filings by and concerning MGPI, wire and press releases published by and regarding MGPI, public conference calls, media and news reports concerning MGPI, and securities analysts' reports and advisories about MGPI.   Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities fraud class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as SEC Rule 10b-5, on behalf of all individuals and entities who purchased or otherwise acquired the publicly traded securities of MGPI between May 4, 2023 and October 30, 2024, inclusive (the "Class Period"), including sellers of MGPI put options during the Class Period.

2.    MGPI is a company that produces and supplies premium distilled spirits, branded spirits, and food ingredients.  MGPI's distilled spirits include premium bourbon, rye, other whiskeys, vodka and gin that are sold to manufacturers of other branded spirits.  MGPI also maintains a portfolio of its own branded spirits.

3.    During the COVID-19 pandemic, alcohol consumption in the United States increased dramatically compared to pre-pandemic times as Americans grappled with the stress and isolation of the pandemic.

4.      MGPI capitalized on this trend by increasing its liquor production and sales, which boosted the Company's financial results.

5.      By late 2022, however, demand for liquor began to weaken and spirits destocking was occurring industry-wide.  Defendants nevertheless assured investors that MGPI had already "cycled through that" and sold a significant portion of its inventory.  Defendants claimed that MGPI's exposure to overstocking was less than its competitors, and that destocking was "not a core issue" because Defendants had properly monitored and managed the Company's inventory levels.

6.      Investors began to learn the truth about MGPI's financial condition and prospects on February 22, 2024, when MGPI issued disappointing guidance for fiscal year 2024 sales.  During MGPI's earnings call that day, MGPI's Chief Executive Officer ("CEO") and President at the time, defendant David S. Bratcher, explained that "inventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024."  Bratcher nevertheless assured that MGPI had "work[ed] closely with our distributors throughout 2023" and "made significant progress in managing wholesaler inventory for our portfolio."  He also claimed that "[h]ealthy demand for our products continue[s] and we believe our business remains well-positioned."

7.      Following this news, MGPI's stock price fell precipitously, declining $13.65 per share, or 14.86%, from a closing price of $91.83 per share on February 21, 2024 to close at $78.18 per share on February 22, 2024.  Defendants continued to make false and misleading statements downplaying the impact of inventory levels on MGPI's performance.

8.      On October 17, 2024, MGPI surprised the market again when it reported disappointing preliminary sales for the third quarter ending September 30, 2024 and lowered its guidance for fiscal 2024.  Explaining the disappointing results and outlook, Bratcher cited "[s]oft

-2-

alcohol spirits category trends and elevated industry-wide whiskey inventories" and stated that the Company expected those "industry headwinds to persist" through the remainder of 2024.

9.    Analysts reacted swiftly and negatively to the news. Wells Fargo lowered its price target for MGPI stock and pointed out that the Company had "credibility concerns" and that it would be "putting MGPI in the penalty box." Following this news, MGPI's stock price fell $24.07 per share, or 29.51%, over the next three trading days, from its closing price of $81.57 per share on October 17, 2024, to close at $57.50 per share on October 22, 2024.

10.    On October 31, 2024, MGPI finally revealed that softening sales and excess inventories would have an "even greater impact" on the Company's sales and profitability in 2025 than it previously forecasted, forcing MGPI to scale back certain operations and lower its revenue and earnings guidance for the year. The market again reacted harshly to the news. An analyst from Lake Street noted in a report that "[MGPI] [s]hares are deservedly getting smoked, down 20% aftermarket." In addition, an analyst from Truist Securities stated during the Company's earnings call that there had been a "slowdown in American whiskey consumption now for 12, almost 18 months," but the "surprise factor is that [Defendants are] just realizing it, seeing it now."

11.    Following the news, MGPI's stock price fell another $8.27 per share, or 14.69%, from its closing price of $56.31 on October 30, 2024 to close at $48.04 on October 31, 2024.

12.    Throughout the Class Period, Defendants made materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects. As a result of Defendants' wrongful acts and omissions, Plaintiff and other class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as many of the acts and practices complained of in this Complaint occurred in substantial part in this District and MGPI common stock trades on the NASDAQ stock exchange located in this District.

16.    In connection with the misconduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

17.    Plaintiff Neil R. Bronstein is a trustee of the Bronstein Children Partnership (the "Partnership").  The Partnership purchased and acquired MGPI securities during the Class Period, including the sale of MGPI put options, and, as a result of Defendants' misconduct alleged in this Complaint, suffered damages in connection with those purchases and acquisitions.

18.    Defendant MGPI is a Kansas company that maintains its headquarters in Atchison, Kansas.  MGPI produces and supplies premium distilled spirits, branded spirits, and food ingredients.  MGPI's common stock trades on the NASDAQ under the ticker symbol "MGPI."

19.     Defendant David S. Bratcher served as MGPI's President and CEO and a member of MGPI's Board of Directors (the "Board") from January 1, 2024 until December 31, 2024.  He previously served as MGPI's Chief Operating Officer and President of the Company's Branded Spirits business.  On December 20, 2024, MGPI announced that Bratcher would resign from the Company's Board on December 31, 2024, and Brandon Gall would succeed him as Interim President and CEO.

20.     Defendant David J. Colo served as MGPI's President and CEO at all relevant times until December 31, 2023.

21.     Defendant Brandon M. Gall served, at all relevant times, as MGPI's Chief Financial Officer and Vice President of Finance.  On January 1, 2025, Gall assumed the additional roles of Interim President and Chief Executive Officer of MGPI.

22.     Defendants Colo, Bratcher, and Gall are collectively referred to as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MGPI's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Individual Defendants were provided copies of the Company's reports and press releases alleged in this Complaint to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their position and access to material non-public information available to them, the Individual Defendants knew that the adverse facts and omissions specified in this Complaint had not been disclosed to, and were being concealed from, the public, and that positive representations and omissions which were being made were then materially false and misleading.

-5-

## IV.    **BACKGROUND**

23.    MGPI is a producer and supplier of premium distilled spirits, branded spirits, and food ingredients.  Distilled spirits include premium bourbon, rye, and other whiskeys ("brown goods") and grain neutral spirits ("GNS"), including vodka and gin ("white goods and other co-products").  MGPI's distilled spirits are either sold directly or indirectly to manufacturers of other branded spirits.   The Company also has a portfolio of its own branded spirits which it produces through its distilleries and bottling facilities and sells to distributors.  MGPI's ingredients products are sold to manufacturers and processors of finished packaged goods or to bakeries.

24.    During the COVID-19 pandemic, alcohol consumption in the United States increased as Americans grappled with the stress and isolation of the pandemic.  Public health researchers have found that from pre-pandemic times (2018) to the height of the pandemic in 2020, heavy alcohol use among Americans rose by 20%, while use of any type of alcohol rose by 4%.  Those increases were sustained in 2022.

25.    The liquor industry capitalized on the trend and experienced significant growth. Companies such as MGPI ramped up their production to meet the unprecedented demand for its products.

26.    Indeed, sales of spirits surged 17% during the pandemic, to the level where, for the first time, "spirits revenue market share (42.9 percent) eclipsed that of beer (41.9 percent)," according to the *Washington Post.*  The significant rise in spirits sales was lauded by the industry's Distilled Spirits Council of the United States lauded as a "great American success story[.]"

27.    By late 2022, however, there were indications that demand for liquor was starting to slow down as inventory levels were elevated industrywide.  For example, on February 23, 2023,

during MGPI's earnings conference call with analysts and investors for the fourth quarter and

year ending December 31, 2022, defendant Colo commented that there were "signs of elevated

distributor inventory levels" in relation to the Company's premium plus brands.  Defendant Colo

responded to an analyst's question about possible supply constraints easing and demand

normalizing, noting that while "[o]bviously there's been a lot of expansions announced in

distilleries. . .  But at this point in time, Marc, we're not seeing any excess capacity on the

market."  Defendant Colo reiterated optimism for the Company's outlook, stating "we feel well

positioned and we think there's going to be adequate demand going forward to support continued

growth."

28.     Defendants continued to misrepresent that demand for MGPI's products remained

healthy and that inventories were at an appropriate level throughout the Class Period.

29.     Unbeknownst to investors, MGPI's inventories had in fact remained elevated and

the Company had not resolved the issue of oversupply in its brown goods.  As a result of

Defendants' materially false and misleading statements and omissions of material facts, the price

of MGPI's securities traded at artificially inflated levels during the Class Period, and caused

plaintiff and other class members to suffer damages.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

30.     On May 4, 2023, before the markets opened, MGPI announced its financial

results for its first quarter ending March 31, 2023, which beat analyst estimates. In a Form 8-K

filed with the SEC on the same date, defendant Colo remarked that "[s]ales of brown goods grew

10% from the prior year period to record levels, driven by strong new distillate customer

commitments, higher pricing across all brown goods, and stronger than expected customer

demand for spot purchases."  With respect to the Branded Spirits segment, defendant Colo stated

"revenue grew 2%" and that toward the end of the quarter, MGPI "realigned our national

-7-

distribution capabilities with Republic National Distributing Company" which, together with the

Company's continued investment in premium plus family of spirits brands, "continues to

position us well for incremental growth and margin expansion opportunities going forward."

31.    On the same day, during MGPI's earnings conference call with analysts and

investors, defendant Colo touted MGPI's impressive growth in sales and continuing demand for

its products:

> Sales of our premium beverage alcohol increased 2%, with
> continued strength in brown goods sales this quarter, supported by
> ongoing solid demand for our new distillate and aged whiskey. ***We
> remain confident that our significant share, scale advantage and
> our aging whiskey inventory position, will continue to support
> the demand within the American whiskey category***.

> We're pleased with the improvement in demand visibility and
> consistency, that we achieved in brown goods as brown good sales
> growth continues to outpace longer- term market trends, and is
> primarily driven by craft as well as multinational customers. ***In an
> effort to moderate the impact of increased input costs, and excess
> supply available in the market*** *for industrial alcohol and white
> goods, as discussed on our previous call,* ***we reduced the volumes
> produced and sold of our industrial alcohol and white goods
> products during the first quarter, to minimize the negative impact
> on our profitability.***[1]

32.    Defendant Colo reiterated that despite industry headwinds, MGPI was "well

positioned" and demand for its products remained strong:

> We are pleased with the solid results delivered this quarter, despite
> increased costs and broader macroeconomic uncertainty. ***Demand
> for our products in each of our three segments remains strong
> and we believe our business continues to be well positioned***. We
> expect to maintain a high level of operational execution and remain
> deliberate in our actions, as we navigate the market dynamics this
> year, which is why we are reconfirming our full year fiscal 2023
> guidance.

---

[1] All emphasis in this Complaint has been added.

33.    Defendant Colo responded to questioning by analysts about MGPI's inventory

levels and stated that they would normalize by the end of the year:

> Vivien Azer:  . . . Can you comment at all on kind of more broadly
> like, what you're hearing from your wholesalers comfort around
> inventory levels, as we've gone through earnings season, it does
> seem -- and it's consistent with your script, there's a lot of caution
> around the US consumer. So I'm just kind of wondering, what
> wholesaler comfort level is with inventories today, what your
> comfort level is with your inventories today? Thank you.
>
> Dave Colo:  Yes. I think in general, I'd say that the ***distributors
> may be hearing a little more inventory at this point than normal***.
> However, kind of the other thing that I think we're anticipating at
> the distributor level is with interest rates continuing to rise and at the
> level they are now, it wouldn't surprise us if some of the
> distributors maybe carried less inventory going forward, because
> their carrying costs are going to be significantly higher than they
> were even a year ago. But that's kind of a different issue than the
> demand side of the equation really to inventory, Vivien. But those
> are a couple of our observations in the market right now.
>
> Vivien Azer:  That's a really interesting consideration to call out.
> ***Is that factored into your full year guidance?***
>
> Dave Colo:  ***It is at this point, yes.***
>
> *          *          *
>
> Sean McGowan:  Question on inventory, would you expect
> inventory levels to stay somewhat elevated in relation to sales as
> the year progresses, or will that be worked down to kind of be
> more in line with the sales growth at the end of the year?
>
> Dave Colo:  That's our expectation. Sean, we think that if the year
> progresses again particularly in line if you look at the carrying cost
> in the current interest rate environment we expect that inventory
> levels will pretty much -- ***shipments should equal to completions
> is the ideal way the industry runs and we anticipate that as the
> year plays out that's where the inventories will kind of normalize
> too***.

34.    The market reacted favorably to Defendants' comments as the price of MGPI

stock rose approximately 6.3% over the following several days, from a closing price of $95.42

per share on May 3, 2023, to a close at $101.43 per share on May 8, 2023.

35.    Defendants continued to make similar positive statements about the demand for

MGPI's products and its inventory levels.  For example, on November 2, 2023, MGPI reported

strong results for the third quarter of 2023 and touted its sales in brown goods, which Defendant

Colo claimed was "driven by strong demand for our new distillate and aged whiskey."

36.    On the same day, during the Company's earnings conference call with analysts

and investors, defendant Colo highlighted the growth in sales of brown goods and claiming that

with MGPI's "visibility" into 2024 improving, it forecasted that "the vast majority" of its brown

goods sales for the year were "already committed" :

> Brown goods sales growth has continued to outpace longer term
> market trends and has been primarily driven by craft, as well as
> multinational customers. Our confidence in our brown goods sales
> visibility for the balance of the year remains high.
>
> ***Looking ahead to fiscal 2024, our visibility is also improving as we
> believe we now have the vast majority of our expected Distilling
> Solutions segment brown goods sales for 2024 already
> committed***.
>
> We believe we are well positioned to support continued growth in
> the American whiskey category. We will continue to be strategic
> with our aged whiskey sales to enable us to meet expected
> customer needs for the balance of this year, as well as position us
> to meet anticipated customer needs in the coming years.

37.    With respect to inventory, defendant Colo stated that they "***remain confident that

inventory destocking for our brands is close to running its course, and we are focused on

driving velocity and points of distribution across our portfolio of brands***."  In addition, he

commented that "[d]emand for our products in each of the three segments remains strong and we

believe our actions will continue to position the business for long-term success."  Defendant Colo

also announced his retirement and that Defendant Bratcher would become the Company's next President and CEO.

38.    Defendant Colo responded to questions by an analyst at Truist Securities concerning inventory levels in MGPI's Branded Spirits business, stating "***we feel like we are pretty much through any issues with excess inventory at the distributor level***.  There may be a few brands that we still have a little bit to work through, but there was really, I don't think our revenue was materially impacted due to any excess inventory issues in the channel."

39.    An analyst from TD Cowen also asked about the volume dynamics between brown goods and white goods, and defendant Gall reiterated that "demand for our brown goods from a volume standpoint remains intact[.]"  Colo further commented that:

> from our perspective, on our inventories, et cetera, what we try to do is balance, particularly on our aged side, our inventory needs and build of inventory with our anticipated future customer needs and demand. And we are still in that position today, we make our laydown decisions based on those anticipated needs and we are not seeing anything today that would tell us that we, as a company, are imbalanced in that particular regard.

## VI.    THE TRUTH BEGINS TO EMERGE

40.    On February 22, 2024, MGPI reported strong financial results for the fourth quarter and year ended December 31, 2023 that showed significant growth in sales, gross profit, and net income.  In the Company's press release announcing the results, Defendant Bratcher stated that "[d]emand for our new distillate and aged whiskey was strong" and that "[w]e are very pleased with our performance for the quarter and full year and remain confident in the long-term sustainability of our business model."

41.    The Company, however, issued weak revenue guidance for fiscal 2024 in the range of $742 to $756 million, which was below analysts' estimates of $787.8 million.  During the Company's earnings call that day, defendant Bratcher acknowledged recent reports that

-11-

"inventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024." He assured, however, that MGPI had "***work[ed] closely with our distributors throughout 2023***" and "***made significant progress in managing wholesaler inventory for our portfolio***." Bratcher also reiterated that "***[h]ealthy demand for our products continue[s] and we believe our business remains well-positioned***."

42.    According to Bratcher, "more than 90% of our new distillate whiskey sales volume is committed in 2024, compared to 50% of our aged whiskey sales volume committed[.]" Bratcher did caution, however, that "[w]e expect total aged whiskey revenues in 2024 to be less than 2023, due to our strategy of developing longer-term stability with new distillate and because of our success in working with longer-term craft customers, who started their brands with aged whiskey and are now moving into the new distillate market."

43.    Defendants Gall and Bratcher sought to downplay concerns about MGPI's performance when an analyst questioned the Company's forecast for lower distillate sales and its comments about whiskey supply levels as they relate to industry headwinds:

> Bill Chappell:  Just wanted to go back on the kind of the new distillate sales, and I think one of the things you said was total sales would be down in '24 versus '23. So if you maybe could give some more color, I think you kind of explained what was some customer changes and stuff like that, but try to understand that?
>
> And then also, you had mentioned that you're monitoring the overall American whiskey supply levels, and that might be a headwind. So kind of maybe help us understand that? Are you talking about at retail or are you talking about supply of other players coming for new distillate?
>
> Brandon Gall:  Yeah, Bill. I'll start on that. Yeah, thanks for giving us the opportunity to clarify. ***So we do not expect new distillate sales to decline year-over-year. In fact, we expect brown goods sales in total to continue to grow in line with or better than the broader category of American whiskey in 2024. What we're trying to get across in our prepared remarks is that the proportion of new distillate sales versus aged sales has been***

***growing.*** And that has been deliberate as David mentioned on the call. And the reason for that is as our customers that traditionally bought aged, as they continue to mature and grow, they're now better able to finance new distillate.

And so we're leaning into that because there's a lot of attributes of new distillate customers that we find attractive, such as the greater visibility they provide and the greater cash flow characteristics of sliding (ph) distillate versus aged brings. ***As far as moderating the overall supply to the industry, that's not our plan. We're continuing to grow with our portfolio and with our customers.*** And as such, the mix may change more towards new versus aged, but we continue to grow at the same pace or better than the American whiskey category as we've done in recent years.

David Bratcher:  Yeah. I'll add to that too, just in clarification. The new distillate focus is really critical for our business. It gives us longer-term arrangements, financial stability, and visibility for multi-years on average. It's a better business for us in terms of understanding the impact financially on the overall business. It also is somewhat a normal cycle, as the category continues to grow and some of our previous craft customers become bigger, they're naturally going to switch over to new distillate supply, that's just normal. ***There is no -- we have no plans to moderate our supply to it.***

As a matter of fact, we've taken just the opposite approach, as you heard in our call (ph) script, that we're expanding one of our major distilleries in Kentucky, basically doubling its capacity and we expect it to come online mid-year. ***So we're very optimistic about Branded sales and a plan to expand and continue to grow with the segment.***

Bill Chappell:  Got it. Now that helps. And then if I'm looking at the, just the aged demand, I understand that you're naturally kind of leaning into the new, but are you hearing from your customers, now you have 800 customers, any worries that there's going to be a slowdown in brown good demand three, four years out from now, or is kind of the overall interest pretty much the same as it has been the past few years?

David Bratcher:  I think what we could say on that is that if we look at our aged distillate and when you referenced about 50% of it being obligated, that's actually pretty high number on aged because most of these tend to be craft customers or new entrants into the category. ***So actually we feel pretty good about the amount that we have contracted and how that relates to any potential***

*unknown* is, is that, those the craft -- the craft distilleries or craft brand companies are subject to the same inventory, retail, wholesale level type of inventory situations as anybody.

And so with higher interest rates and everything else, they're being a little more cautious with their investment. In the past, we've saw them buy just so they could corner their piece of the business. Now you're starting to see them switch to more just-in-time type of demand. They want to transact, know they can fill the product and get it right through the shelf, given the high interest rates that they operate in.

Bill Chappell**:**  Got it. And last question, just on the aged, sorry, on the Branded portfolio, your comments about there's still some destocking at distributors and stuff like that, does that mean, I thought most of the impact you kind of saw in the first half of last year, do you expect a quarter where we could be flat to down for that overall business, excluding Penelope or is most of the heavy destocking done?

David Bratcher**:**  The comment in general was about the industry overall. ***There is still a push on inventory destocking for the industry overall. As it relates specifically to our business, we've worked really hard in the past year to manage that -- actively manage that with our wholesalers. We believe we have it in a controllable area of data on hand.*** At the end of the day, the wholesalers do control the inventory and they place the order and they decide what the number is. ***I think our exposure on it for us is smaller than, let's say, our peer set because I think we've done a really good job of managing it in 2023.***

44.    These statements by Defendants were false and misleading because demand for

MGPI's products had already been declining amidst an oversupply of alcoholic beverages, and

these factors contributed to the expected decline in whiskey revenues for 2024.

45.    Following this news, the price of MGPI stock fell $13.65 per share, or 14.86%,

from a closing price of $91.83 per share on February 21, 2024 to close at $78.18 per share on

February 22, 2024.  Defendants continued to downplay the situation, promising investors that

high inventory levels were not a significant concern.

-14-

46.     On May 2, 2024, MGPI reported disappointing results for the quarter ending March 31, 2024, including $170.6 million in revenue, 15% lower from the same period a year ago, and $20.6 million in net income, a 34% decline year-over-year.  The Company nevertheless reiterated its 2024 guidance of revenues between $742 million to $756 million.

47.     On the same day, MGPI conducted a conference call with analysts and investors during which defendant Gall stated that MGPI "continue[s] to monitor the potential impact of inventory levels at distributors, overall American whiskey supply and consumption patterns and inflation," and was optimistic that the Company was "*uniquely positioned to grow as a company in this dynamic operating environment*." Defendant Bratcher noted that inventory had "*stabilized*" as the Company had "*worked really hard with our distributors and understanding the inventory levels and managing those levels within to meet customer demand*."  He further added that "*destocking for us at a distributor level is not a core issue*," and the Company had "*been able to… get that inventory managed to the right level[.]*"

48.     On August 1, 2024, MGPI announced its results for the quarter ending June 30, 2024 and during an earnings call with analysts and investors on the same day, defendant Bratcher said that "*[d]istributor inventories for our branded portfolio remain relatively stable, even below historical levels*[.]," Bratcher emphasized that "*inventory is exactly where we need; it has been exactly where we need it*," and that the Company "continue[d] to monitor [inventories] on a daily basis."  Defendant Gall similarly commented that "*[d]istributor inventory levels for our brands are in good shape*."

49.     On October 17, 2024, the Company announced surprisingly weak preliminary financial results for the quarter ending September 30, 2024, revealing that sales were expected to decline 14% year-over-year, excluding the impact of the closing of their distillery in Atchison,

-15-

Kansas.  MGPI also significantly lowered its 2024 guidance, with revenues expected in the range of $695 million to $705 million, well below the range of $742 million to $756 million forecasted at the end of the previous quarter.  Defendant Bratcher acknowledged to investors for the first time that high inventory levels were negatively impacting the Company's performance, stating that "[s]oft alcohol spirits category trends and elevated industry-wide whiskey inventories are putting greater than expected pressure on our brown goods business with a larger impact on our smaller, craft customer base."  In addition, Bratcher revealed that "[w]e expect these industry headwinds to persist at least through the rest of the year[.]"

50.    The market reacted swiftly and negatively to this news.  For example, Lake Street wrote in an October 18, 2024 report that the preliminary results were "breathtaking" and shares were "deservedly getting smoked."  With respect to the decline in brown goods sales, Lake Street reportedly noted that the "magnitude of this decline was a material surprise given how much visibility we thought existed via the contracted status of this business," calling MGPI a "show-me" stock and predicting that the "market will not give MGPI the benefit of the doubt."

51.    Similarly, TD Cowen commented that the news was "worse than we expected," and Truist Securities echoed that sentiment, calling the sudden downturn "surprising" even though the market was already "well aware of the supply issues in the industry."

52.    Wells Fargo issued a report on MGPI's negative pre-announcement that criticized the Company's credibility:

> Negative pre-announcement. Post close 10/17, MGPI announced softer Q3 results and cut the FY24 guide (sales -6.5%, EBITDA - 10% at mid-point), citing category deceleration and elevated inventories pressuring demand. Even with strong H1 delivery, these overhangs have been a headwind to MGPI shares, and now materializing on a lagged basis vs branded peers. We think the lowered outlook raises credibility concerns, with reduced visibility into Q4/FY25 likely putting MGPI in the penalty box near term.

-16-

53.     Following this news, MGPI's stock price fell precipitously, declining $24.07 per share over the next three trading days, or 29.51%, from its closing price of $81.57 per share on October 17, 2024 to close at $57.50 per share on October 22, 2024.

54.     On October 31, 2024, in a press release announcing MPGI's financial results for the third quarter of 2024, defendant Bratcher cited "the softening American whiskey category trends and elevated industry-wide barrel inventories" as factors negatively affecting MGPI's quarterly results and causing MGPI "to further lower our net aging whiskey put away, scale down our whiskey production, and optimize our cost structure to mitigate lower production volumes."

55.     On the same day, during MGPI's earnings conference call with investors and analysts, defendant Bratcher acknowledged that "slower growth and higher inventories are leading to lower demand, lower prices and reduced visibility on our contract distilling sales." Defendant Gall also revealed that the Company is "significantly reducing our brown goods production to better align with demand in 2025. At the same time, softer American whiskey growth and elevated barrel inventories continue to constrain demand for aged whiskey and increasingly our new distillate."

56.     Analysts on the earnings call expressed disbelief in Defendants' belated acknowledgment of the slowdown in alcohol consumption and the negative impact on MGPI's results. An analyst from Truist Securities commented "we've seen a slowdown in American whiskey consumption now for 12, almost 18 months. And so I guess the surprise factor is that you're just realizing it, seeing it now." Another analyst from Sturdivant was surprised that the Individual Defendants "missed" the slowdown and asked defendant Bratcher to explain:

> Mitch Pinheiro:  Okay. Then getting back to the -- it does surprise
> me that industry-wide everybody sort of missed the slowdown. I'm

-17-

curious whether any of that has to do with any on-premise, off-premise trends that may have been missed?

And then the second question is, what also may have been missed, which I've been seeing for a while is, consumer liquor cabinet destocking. Once you can -- once you're able to get your favorite brand back during the COVID error, it was hard to find it. And if you found a bottle or 2, you bought 2 or 3 or 4 bottles because you weren't sure you were ever going to see them again.

And I guess at some point, consumers decided -- they felt more comfortable with starting to see their favorite brands on the shelves and starting to -- instead of buying it, just going through their own cabinet and reducing their own inventory, I guess there's no way -- Have you done any research on that part of the equation as far as the slowdown in consumption is concerned? And just also the comments on the premise versus -- on-premise versus off-premise missing the slowdown here?

David Bratcher:  Okay. And I'll take that one. So in general, if you think about on-premise versus off-premise, the mix is roughly the same, but the problem post-COVID, you know, there's not as many as on-premises as there was. So you're still seeing that being relaunched over time. I'm not going to attribute that mix to the industry's view on why it happened. I tend to take more of a macro view on this. I tend to think that we're in the middle of an election. We've had all kinds of interesting things going on in the environment. Consumer spending is a little bit slower than this.

I think there's a lot of external pressures going on here that is making that consumer make different choices, all right? And so I don't want to speculate on they're selling more there or not selling more there. I'm attributing it to that consumer. I also bring it back to this COVID piece. Having done this for 30 years in the brands, what we're selling back to is about what we should be in the industry. ***COVID was great for our industry for the period of time***.

***And now when we all reflect back and we look at these last few years of correction, and it is inventory destocking at a wholesaler, it is inventory destocking in a pantry.***

You've got multitudes of variables coming to a head. Those too shall pass. Now what we all are terrible at doing, myself and everybody else in the industry is telling you exactly when that's going to pass. You know why? Because we can't read the

-18-

> consumers' minds. We can only watch what they're doing and react to their needs.

57. Following this news, the price of MGPI stock declined $8.27 per share, or 14.69%, from its closing price of $56.31 per share on October 30, 2024, to close at $48.04 per share on October 31, 2024.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

58. As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

59. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding MGPI, their control over, receipt and/or modification of MGPI's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning MGPI, participated in the fraudulent scheme alleged herein.

## VIII. LOSS CAUSATION

60. During the Class Period, as detailed herein, Defendants made a series of false and misleading statements and omissions that artificially inflated the prices of MGPI securities, and operated as a fraud or deceit on Class Period investors who purchased or otherwise acquired MGPI securities, by failing to disclose to investors material adverse facts. When Defendants' misrepresentations and fraudulent conduct were disclosed, the price of MGPI securities fell precipitously as the prior inflation came out of the price of the Company's securities. As a result

-19-

of their purchases and acquisitions of MGPI securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

61.     By Defendants' failing to disclose the true state of the Company's business, investors were not aware of the true state of the Company's financial status. Therefore, the Defendants presented a misleading picture of MGPI's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused MGPI to conceal the truth.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

62.     At all relevant times, the market for MGPI securities was an efficient market for the following reasons, among others:

a.      MGPI common stock met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient, national stock market;

b.      as a regulated issuer, MGPI filed periodic public reports with the SEC;

c.      according to the Company's Form 10-K for the fiscal year ended December 31, 2023, MGPI had approximately 22 million shares of common stock outstanding as of December 31, 2023;

d.      MGPI regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

e.      unexpected material news about MGPI was rapidly reflected in and incorporated into prices for MGPI securities during the Class Period.

63.     As a result of the foregoing, the market for MGPI securities promptly digested current information regarding MGPI from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of MGPI securities during the Class Period suffered similar injury through their purchases of MGPI securities at artificially inflated prices and a presumption of reliance applies.

64.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    **THE STATUTORY SAFE HARBOR**

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of

-21-

those forward looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of MGPI who knew that those statements were false when made.

## XI.    CLASS ACTION ALLEGATIONS

66.    Plaintiff bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded securities of MGPI between May 4, 2023 and October 30, 2024 (the "Class Period"), including sellers of MGPI put options.

67.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of MGPI, members of MGPI's Board, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of MGPI.

68.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MGPI's stock was actively traded on the NASDAQ. While the exact number of class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class. Class members may be identified from records maintained by MGPI or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

69.    Plaintiff's claims are typical of all other class members' claims, as all class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the class members and has retained counsel competent and experienced in class and securities litigation.

71.     Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual class members.  Among the questions of law and fact common to the Class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about MGPI's operations, business, performance, and future prospects; (iii) to what extent the class members have sustained damages; and (iv) the proper measure of such damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    CAUSES OF ACTION

### COUNT I

#### Violation of Section 10(b) of the Exchange Act
#### Against All Defendants

73.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is brought against Defendants pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

74.     During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to make

materially false or misleading statements and omissions of material fact alleged herein to:
(i) deceive the investing public, including Plaintiff; (ii) cause the market price of MGPI
securities to trade above its true value; and (iii) cause Plaintiff as well as other class members to
purchase or otherwise acquire MGPI securities at artificially inflated prices that did not reflect
the securities' true value during the Class Period.  In furtherance of their unlawful scheme, plan,
or course of conduct, Defendants took the actions alleged herein.

75.    While in possession of material adverse non-public information, Defendants,
individually and in concert, directly or indirectly, by the use of means and instrumentalities of
interstate commerce, the U.S. mails, and the facilities of a national securities exchange:
(i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements
of material fact and/or failed to disclose material facts necessary in order to make the statements
made, in light of the circumstances under which they were made, not misleading; and (iii) engaged
in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers
and acquirers of the Company's securities in an effort to maintain artificially high market prices
for MGPI securities, in violation of § 10(b) and Rule 10b-5.  Defendants are alleged as primary
participants in the wrongful conduct alleged herein.

76.    Defendants acted with knowledge or a reckless disregard for the truth of the
materially misrepresented and omitted facts alleged herein in that they failed to disclose such facts
even though such facts were readily available to them, if not known.  Defendants' material
misrepresentations and omissions were made knowingly and/or recklessly for the purpose and
effect of concealing the truth regarding MGPI's operations, business, performance, and future
prospects from the investing public and supporting the artificially inflated price of its securities.

-24-

77.     As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already in the market price of MGPI securities during the Class Period. Plaintiff and other class members purchased or otherwise acquired MGPI securities during the Class Period at artificially inflated prices in direct or indirect reliance on: (i) the materially false or misleading statements made by Defendants; (ii) the efficiency and integrity of the market in which the Company's securities trade; and (iii) the absence of material adverse information that Defendants knew of or recklessly disregarded but did not publicly disclose.  As the previously misrepresented and/or concealed material facts eventually emerged, the price of MGPI securities substantially declined, causing losses to Plaintiff and other class members.

78.     At the time of the material misrepresentations and omissions alleged herein, Plaintiff and other class members were not aware of their falsity and believed them to be true. Had Plaintiff and other class members known the relevant truth regarding MGPI's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiff and other class members would not have purchased or otherwise acquired MGPI securities at artificially inflated prices.

79.     By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other class members suffered damages in connection with their transactions in the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

-25-

80.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is brought against the Individual Defendants pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

81.     Prior to and during the Class Period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning MGPI, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

82.     In their respective roles, the Individual Defendants had regular access to non-public information about MGPI's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of MGPI's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

83.     Each of the Individual Defendants was a controlling person of MGPI within the meaning of § 20(a), as alleged herein.  By virtue of their high-level positions, their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiff alleges were materially false and misleading.

84.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers and acquirers of MGPI securities during the Class Period, which included the dissemination of materially false or

-26-

misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) set forth above. The scheme: (i) deceived the investing public regarding MGPI's operations and the true value of MGPI's securities; and (ii) caused Plaintiff and other class members to purchase or acquire MGPI securities at artificially inflated prices, which plummeted in value when the truth concerning MGPI's business, operations, performance, and future prospects was revealed.

85.     The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements that Plaintiff alleges were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be corrected.  In particular, the Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein and exercised the same.

86.     As set forth above, Defendants violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of § 10(b) and Rule 10b-5, the Individual Defendants are liable under § 20(a).  As a direct and proximate result of the Individual Defendants' culpable conduct, Plaintiff and other class members suffered damages in connection with their transactions in MGPI's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, including:

1.     Certification of this action as a class action;

-27-

2.      Awarding compensatory damages against all Defendants, jointly and severally,

for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at

trial, including interest thereon, as allowed by law;

3.      Awarding Plaintiff his costs and expenses incurred in this action, including

reasonable counsel fees and expert fees; and

4.      Awarding such other and further relief as may be just and proper.

## XIV.   **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:       February 13, 2025

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By: /s/ Daniel P. Chiplock
    Daniel P. Chiplock (DC-1137)

    Sharon M. Lee (SL-5612)
    250 Hudson Street, 8th Floor
    New York, NY  10013-1413
    Tel.:  (212) 355-9500
    Facsimile: (212) 355-9592

    *Attorneys for Plaintiff Neil R. Bronstein, as*
    *Trustee for the Bronstein Children*
    *Partnership*

3174504.2

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Neil R. Bronstein, a Trustee of the Bronstein Children Partnership, certify that:

1. I have reviewed the facts and allegations of the complaint filed in this action.

2. The Bronstein Children Partnership (the "Partnership") did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. The Partnership is willing to serve as a Lead Plaintiff either individually or as part of a group. The Partnership understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

4. I represent and warrant that I am authorized to execute this Certification on behalf of the purchaser of the securities described herein (including, as the case may be, myself, my immediate family, any co-owners, any corporations or other entities, and/or any beneficial owners).

5. The Partnership will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. The Partnership understands that this is not a claim form and that the Partnership's ability to share in any recovery as a member of the class is unaffected by the Partnership's decision to serve as a representative party or Lead Plaintiff.

7. I have listed all of the Partnership's relevant transactions involving MGP Ingredients, Inc. securities that are the subject of this action in the attached schedule.

8. During the three years prior to the date of this Certification, the Partnership has not sought to serve and it has not served as a representative party for a class in an action filed under the federal securities laws except (if any):

I declare under penalty of perjury, under the laws of the United States, that the information herein is accurate.

Bronstein Children Partnership

Executed this __30TH__ day of __January__ , 2025

Neil Bronstein
89F8BF35F5844EE...

_____

Neil R. Bronstein, Trustee

SCHEDULE A (Bronstein Children Partnership)
**MGP Ingredients, Inc (NYSE: MGPI)**
Class Period: 5/4/2023 - 10/30/2024
**Common Stock:**

| Date | Transaction Type | Shares | Description | Price |
|------|------------------|--------|-------------|-------|
| 8/18/2023 | Sell | 10,000 | MGP INGREDIENTS INC | $115.00 |
| 5/20/2024 | Purchase | 600 | MGP INGREDIENTS INC | $95.00 |
| 5/20/2024 | Purchase | 3,400 | MGP INGREDIENTS INC | $95.00 |

**Options:**

| Date | Transaction Type | Contracts | Description | Price |
|------|------------------|-----------|-------------|-------|
| 5/4/2023 | Sell | 40 | CALL MGPI $105 EXP 06/16/23 | $3.00 |
| 6/16/2023 | Expired | 40 | CALL MGPI $105 EXP 06/16/23 | |
| 7/18/2023 | Sell | 46 | CALL MGPI $115 EXP 08/18/23 | $4.50 |
| 7/18/2023 | Sell | 21 | CALL MGPI $115 EXP 08/18/23 | $4.50 |
| 7/18/2023 | Sell | 15 | CALL MGPI $115 EXP 08/18/23 | $4.50 |
| 7/18/2023 | Sell | 10 | CALL MGPI $115 EXP 08/18/23 | $4.50 |
| 7/18/2023 | Sell | 8 | CALL MGPI $115 EXP 08/18/23 | $4.50 |
| 8/18/2023 | Assigned | 100 | CALL MGPI $115 EXP 08/18/23 | |
| 10/26/2023 | Sell | 40 | PUT MGPI $95 EXP 06/21/24 | $9.70 |
| 5/20/2024 | Assigned | 6 | PUT MGPI $95 EXP 06/21/24 | |
| 5/20/2024 | Assigned | 34 | PUT MGPI $95 EXP 06/21/24 | |
| 8/26/2024 | Sell | 100 | CALL MGPI $105 EXP 12/20/24 | $3.25 |
| 10/8/2024 | Sell | 40 | PUT MGPI $80 EXP 03/21/25 | $8.65 |
| 10/31/2024 | Assigned | 31 | PUT MGPI $80 EXP 03/21/25 | |
| 11/1/2024 | Assigned | 9 | PUT MGPI $80 EXP 03/21/25 | |
| 12/20/2024 | Expired | 100 | CALL MGPI $105 EXP 12/20/24 | |